**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JACKIE EPPS, as Putative Administratrix of the Estate of ANNIE MAE SETZER, ) ) ) ) | |
| | CIVIL ACTION FILE NO. |
| Plaintiff, ) | |
| | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| JOHNSON & JOHNSON, ) JOHNSON & JOHNSON ) CONSUMER, INC., JOHNSON ) & JOHNSON CONSUMER ) COMPANIES, INC., JOHNSON ) & JOHNSON CONSUMER ) PRODUCTS COMPANY, and ) IMERYS TALC AMERICA, INC., F.K.A. LUZENAC AMERICA, INC., | |
| Defendants. | |

**COMPLAINT**

COMES NOW, Plaintiff Jackie Epps, as Putative Administratrix of the Estate of Annie Mae Setzer, deceased, by and through undersigned counsel, files this Complaint against Defendants Johnson & Johnson, Johnson & Johnson Consumer, Inc., Johnson & Johnson companies, Inc., Johnson and Johnson Consumer Products Company (collectively "J&J Defendants") and Imerys Talc America, Inc., formerly known as Luzenac America, Inc. ("Imerys") and states:

## INTRODUCTION

1.      Plaintiff's claims in this action are a direct and proximate result of the Defendants' intentional, negligent, willful and wrongful conduct in connection with its design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling and/or sale of Johnson & Johnson Baby Powder and Shower to Shower (hereafter, "Talcum Powder Products."). Plaintiff seeks recovery for damages resulting from Decedent Annie Mae Setzer's development of ovarian cancer and subsequent death from ovarian cancer, which were directly and proximately caused by the conduct of the Defendants.

## THE PARTIES

2.      Plaintiff Jackie Epps, (herein "Plaintiff"), resides in Douglasville, Douglas County, Georgia.

3.      Decedent Annie Mae Setzer was, at the time of her death, a resident of Douglasville, Douglas County, Georgia. For a period of over 70 years, and up to the time of her death, Decedent Annie Mae Setzer regularly purchased and applied Talcum Powder Products in North Carolina and Georgia. On or about September 13, 2014, she was diagnosed with advanced stage ovarian cancer. Her development of ovarian cancer was a direct and proximate result of her use of the unreasonably dangerous and defective Talcum Powder Products and the Defendants' wrongful and negligent conduct in their design, development, manufacture, testing, packaging, promoting,

marketing, distribution, labeling and/or sale Talcum Powder Products. As a direct and proximate result of the Defendants' conduct, Annie Mae Setzer suffered significant damages, including, but not limited to medical bills, loss of enjoyment of life, excruciating pain and suffering and, ultimately, death.

4.     Defendant Johnson & Johnson is, and at all times relevant was, a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

5.     At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, selling, marketing and distributing Talcum Powder Products to millions of customers in the United States, including in the State of Georgia.

6.     Defendant Johnson & Johnson Consumer, Inc. is, and at all times relevant was, incorporated under the laws of the State of New Jersey, with its corporate headquarters located at 199 Grandview Road, Skillman, New Jersey 08558. Johnson & Johnson Consumer, Inc. operates as a subsidiary to Johnson & Johnson.

7.     At all relevant times, Johnson & Johnson Consumer, Inc. was engaged in the business of researching, developing, manufacturing, distributing, marketing and selling Talcum Powder Products specifically targeted at women, babies and mothers. Johnson & Johnson Consumer, Inc., in concert with Johnson & Johnson, marketed, distributed, and sold Talcum Powder Products to millions of consumers in the United States, including in Georgia. Defendant Johnson & Johnson Consumer, Inc. also now

does business as and/or has formerly been known as Johnson & Johnson Consumer Companies, Inc. and as Johnson & Johnson Consumer Products Company.

8.      Defendant Johnson & Johnson Consumer Companies, Inc. is incorporated under the laws of the State of New Jersey, with its corporate headquarters located at 199 Grandview Road, Skillman, New Jersey 08558.

9.      At all relevant times, Johnson & Johnson Consumer Companies, Inc. operated as a subsidiary of Johnson & Johnson. Johnson & Johnson Consumer Companies, Inc. is in the business of researching, developing, manufacturing, distributing, marketing and selling Talcum Powder Products targeted at women, mothers and babies. Johnson and Johnson Consumer Companies, Inc., in concert with Johnson & Johnson, marketed, distributed, and sold Talcum Powder Productions to millions of consumers in the United States, including in the State of Georgia.

10.     Defendant Johnson & Johnson Consumer Products Company is incorporated under the laws of the State of New Jersey, with corporate headquarters located at 199 Grandview Road, Skillman, New Jersey 08558.

11.     Johnson & Johnson Consumer Products Company operates as a subsidiary to Johnson & Johnson. Johnson & Johnson Consumer Products Company researches, develops, manufactures, distributes, markets, and sells consumers Talcum Powder Products targeted at babies, mothers, and women in general. Johnson & Johnson Consumer Products Company, in concert with Johnson & Johnson, marketed,

distributed, and sold Talcum Powder Productions to millions of consumers in the United States, including in the State of Georgia.

12.     For purposes of this Complaint, Defendants Johnson & Johnson, Johnson & Johnson Consumer, Inc., Johnson & Johnson Consumer Companies, Inc. and Johnson & Johnson Consumer Products Company are all referred to jointly as J&J Defendants and, additionally, they are both the alter egos and legal extensions of one other. In doing the acts alleged herein, J&J Defendants were acting in the course and scope of such agency, representation, joint venture, conspiracy, consultancy, predecessor agreement, successor agreement, service and employment, with knowledge, acquiescence, and ratification of each other.

13.     Defendant Imerys, formerly known as Luzenac America, Inc., is a Delaware Corporation with its principal place of business in the San Jose, California.

14.     At all pertinent times, Imerys has been in the business of mining and distributing talc and/or talcum powder for use in consumer products, including the Talcum Powder Products.    Imerys is the successor or corporate continuation of Luzenac America, Inc.  Imerys is legally responsible for all liabilities incurred when it was known as Luzenac America, Inc.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and

Defendants, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over J&J Defendants and Imerys, consistent with the Georgia and United States Constitutions, because Defendants caused tortious injury in Georgia by acts and/or omissions both within and outside of the State of Georgia.   J&J Defendants and Imerys regularly conducted, and do conduct, business in Georgia from which they both derive substantial revenue.  J&J Defendants and Imerys have marketed, mined for sale in Georgia, promoted, distributed, and sold Talcum Powder Products in Georgia, and J&J Defendants and Imerys have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State to render the exercise of jurisdiction by this Court permissible.

17.     Venue is proper in the Northern District of Georgia, pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while she resided in this judicial district and because Defendants are otherwise subject to personal jurisdiction in this district by virtue of their contacts with this district. Venue is also proper under 18 U.S.C. § 1965(a) because J&J Defendants and Imerys transact substantial business in this district. Additionally, venue is proper in this division, pursuant to LR 3.1B (1)(2)

& (3) because Plaintiff resides in this division and because the cause of action arose in this division.

18.     J&J Defendants and Imerys expected and should have expected that their business activities could or would have consequences within the State of Georgia, as well as throughout the United States.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

19.     J&J Defendants began marketing and selling products containing talc, including Johnson's Baby Powder, as early as 1893. Since that time, J&J Defendants have continued to sell and market these products for daily use by women and babies to absorb excess moisture and eliminate friction on the skin.   In the 1960s, J&J Defendants began selling and marketing Shower to Shower to women for the same purpose.

20.     Imerys mined the talc contained in the Talcum Powder Products.

21.     At all relevant times, Cornstarch, which is a safer, feasible alternative to the Talcum Powder Products, existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects.   Cornstarch powders have been sold and marketed for the same uses, by J&J Defendants and others, with the same effectiveness as the Talcum Powder Products.

22.     Talcum Powder Products are made mostly of talc and fragrance. Talc is an inorganic material and is composed of hydrated magnesium silicate.   As noted

above, it is mined by Imerys for J&J Defendants. Talc is used for a variety of purpose, including to manufacture goods, such as paper making, plastic, paint and coatings, rubber, electric cable, ceramics, and cosmetics. In its loose form and as used in Talcum Powder Products, talc is known as "talcum powder."

23.     Talc is a carcinogen.

24.     Imerys, now and when known as Luzenac America, Inc., continually advertised and marketed talc as safe for human use.   Imerys has supplied customers, including the J&J Defendants, with Material Safety Data Sheets ("MSDS") for talc. These MSDS are supposed to convey adequate health and warning information to its customers.

25.     At all relevant times, J&J Defendants have consistently marketed Talcum Powder Products to women to use in their perineal regions (genital area) as a means of maintaining freshness and cleanliness and eliminating friction on the skin. Throughout its history, J&J Defendants have advertised the Talcum Powder Products as safe and gentle for use on babies and women.  One of the Talcum Powder Products currently states, "J&J's [Talcum Powder Products are] designed to gently absorb excess moisture helping skin feel comfortable. Our incredibly soft, hypoallergenic, dermatologist and allergy-tested formula glides over skin to leave it feeling delicately soft and dry while providing soothing relief." J&J Defendants instruct consumers on the product labeling to "Shake powder directly into your hand, away from the face,

before smoothing onto the skin."

26.     J&J Defendants marketing, including on their website, for Talcum Powder Products, encouraged and targeted, and continues to encourage and target women to use their products daily.   Specifically, for Johnson's Baby Powder, under "HOW & WHEN TO USE," J&J Defendants instruct customers as follows: "For baby, use after every bath and diaper change. For you, use anytime you want skin to feel soft, fresh, and comfortable." On their website, J&J Defendants also state the product is "Clinically proven to be safe, gentle and mild." Imerys was aware of J&J's use and marketing of its Talcum Powder Products.

27.     At all relevant times, J&J Defendants advertised and marketed their "Shower to Shower" product as safe for use by women and encouraged them to use it all over their body, including in their perineal regions.   The slogans on "Shower to Shower read "A sprinkle a day keeps odor away" and "Your body perspires in more places than just under your arms."

28.     At all relevant times, J&J Defendants heavily marketed Talcum Powder Products to African-American and Hispanic women, who disproportionately used the products.

29.     Decedent Annie Mae Setzer used the Talcum Powder Products to dust her perineal regions for feminine hygiene purposes.   Not only was this a foreseeable use of the product, but it was a use that J&J Defendants encouraged through its

advertising, marketing and labelling of the Talcum Powder Products.

30.     There are no warnings on the front of any Talcum Powder Products. On the rear side of the product. There are no warnings related to the use of talcum powder in the perineal region and the increased risk of ovarian cancer.

31.     At all relevant times, J&J Defendants have sought to convey an image of a safe and trusted family brand.  For example, on its website, J&J Defendants market their products as a "A Brand Built on Love & Science."  J&J Defendants also seek to reassure consumers of their products' "safety" by touting that they have "some of the most rigorous product testing and safety and quality standards...." J&J Defendants website also contains a section entitled "Our Safety & Care Commitment" - www.safetyandcarecommitment.com.     In this section, J&J Defendants claim that "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed." J&J Defendant's alleged "Promise to Parents and their Babies" includes, "When you bring our [Talcum Powder Products] into your home, you can be assured of our commitment to the safety of your family and families around the world." Imerys was aware of the J&J Defendant's use and this marketing of its Talcum Powder Products. Nowhere do J&J Defendants or Imerys warn of the increased risk of ovarian cancer linked to the use of Talcum Powder Products.

32.     As detailed below, beginning in at least 1982, J&J Defendants and

Imerys were aware of several studies that demonstrated that women who used talc-based baby powder in the genital area had a significant increased risk of ovarian cancer. Since 1982, there have been well over 20 studies, meta-analyses, reports and publications by doctors and scientists throughout the world, the majority of which show a statistically significant increased risk of ovarian cancer with the use of talcum powder in the perineum.

33.    J&J Defendants and Imerys, however, operate in complete denial of the fact that the Talcum Powder Products are unsafe and can cause ovarian cancer. Both J&J Defendants and Imerys have failed, and continue to fail, to warn customers of the dangers associated with the use of Talcum Powder Products.

34.    In a 1971 study, researchers discovered a link between ovarian cancer and talcum powder use after finding talc particles "deeply embedded" in 10 of 13 ovarian tumors, 12 of 21 cervical tumors, one primary carcinoma of the endometrium, and 5 of 12 "normal" ovaries from women with breast cancer. Henderson, W.J., et al., *Talc and carcinoma of the ovary and cervix,* 78 (3) J. Obstet. Gynaecol. Br. Commonw. 266-272 (1971).   J&J Defendants and Imerys were aware of this study shortly after its publication.

35.    In 1982, Dr. Daniel Cramer of the Departments of Obstetrics, Gynecology, and Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the Department of Epidemiology, Harvard School of Public

Health and the Department of Pathology, Massachusetts General Hospital, Harvard Medical School, conducted a case-control study ("the "Cramer Study"), funding by the National Institutes of Health, which found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the substance of the ovary causing foreign body reaction and growth of epithelial ovarian tissue. The Cramer Study found a statistically significant 92% increased risk of ovarian cancer from genital talc use, thus proving an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer. Cramer, D.W., et al., *Ovarian cancer and talc: a case-control study,* 50 Cancer 372-376 (1982).

36.    Shortly after publishing the Cramer Study, Dr. Cramer met with Dr. Semple of Johnson & Johnson and strongly advised him to put a warning on Johnson & Johnson's talc-based body powders regarding the increased risk of ovarian cancer. Despite these direct communications, J&J Defendants and Imerys failed to provide any warning regarding the dangers.

37.    In an August 12, 1982, New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," J&J Defendants admitted being aware of the 1982 Cramer Study. Imerys was aware of this admission.

38.    Since the Cramer Study was conducted, there have been over 20 additional studies and other publications by reputable doctors and scientists throughout the world.    The vast majority of these studies and publications have

reported an elevated risk for ovarian cancer associated with perineum use of talcum powder and the majority of the studies show statistically significant elevations.   J&J and Imerys became aware of these studies and publications in a timely manner following their publication.

39.    In 1992, the first meta-analysis was conducted by Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and Women's Hospital. This was the most comprehensive study to date - 235 cases of women with ovarian cancer were compared to 239 controls. Harlow and Cramer found that nearly 17% of the control group reported frequent talc application to the perineum. The study found, "[T]he most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals).... Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." The study concluded, "[A] lifetime pattern of talc use may increase the risk for epithelial ovarian cancer.... Given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Harlow, B.L. et al., *Perineal exposure to talc and ovarian cancer risk,* Obstet. Gynecol. 1992, 19-26. The summary OR (and 95% confidence interval) was 1.3 (1.1, 1.6) indicating a statistically significant 30% increased risk of ovarian cancer from genital talc use. J&J Defendants and Imerys were aware of this study

shortly after its publication.

40.     Three additional meta-analyses were conducted by separate researchers throughout the 1990s.  These analyses similarly showed a statistically significant increased risk of ovarian cancer from genital talc use.  J&J Defendants and Imerys were aware of these meta-analyses shortly after publication.

41.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Most notably, talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats andB6C3F 1 mice (Inhalation studies),* Technical Report Series No 421 (Sept. 1993). J&J Defendants and Imerys were aware of this study shortly after its publication.

42.     On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter to then Johnson & Johnson CEO, Ralph Larson, informing J&J Defendants that studies as far back as 1960's "... show [] conclusively that the frequent use of talcum powder in the genital area poses a serious risk of ovarian cancer." The letter cited a study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. The letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very

difficult to detect and has a low survival rate. The letter concluded by requesting that J&J Defendants withdraw Talcum Powder Products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.    Imerys was also aware of the CPC letter.

43.    By 1996, the condom industry, at the request of the Food & Drug Administration, stopped dusting condoms with talc due to the health concerns of ovarian cancer.  As a result, J&J Defendants and Imerys were aware of this request shortly after its publication.

44.    In response to the United States Toxicology Program's study finding clear evidence of carcinogenic activity associated with the use of talc, the Cosmetic Toiletry and Fragrance Association (CTFA), now known as the PCPC, formed the Talc Interested Party Task Force (TIPTF).  Both J&J Defendants and Imerys were members of the CTFA and were the primary actors and contributors of the TIPTF.

45.    On September 17, 1997, Alfred Wehner, a toxicology consultant retained by J&J Defendants, wrote a letter to Michael Chudkowski, manager of Pre-Clinical Toxicology at Johnson & Johnson Consumer Products, Inc., stating that on three separate occasions. the TIPFT had released false information to the public about the safety of talc. Specifically addressing a November 17, 1994, statement released by the CTFA, Dr. Wehner said the following:

The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: "The workshop concluded that, although some of these studies suggested a weak association might exist, when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate, to phrase it euphemistically. At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary. The workshop did not conclude that "the results of the studies are insufficient to demonstrate any real association." As pointed out above, a "real" statistically significant association has been undeniably established independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper, Debra Heller, and others.

46.    In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System. Asbestos is also classified as "D2A." J&J and Imerys became aware of this classification in a timely manner following its announcement.

47.    In February of 2006, the International Association for the Research of Cancer ("IARC"), part of the World Health Organization, published a paper whereby they classified genital use of talc-based body powder as a "Group 2B" possible human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk in ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. J&J Defendants and Imerys were aware of this study shortly after its publication.

48.    In its February 2006 paper, IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence." IARC

concluded with this "Overall evaluation:" "Perineal use of talc based body powder is possibly carcinogenic to humans (Group 2B)." J&J Defendants and Imerys were aware of this study shortly after its publication.

49.    In 2006, Imerys began placing an ovarian cancer warning on its MSDS it provides to J&J Defendants. These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well. Although J&J Defendants admittedly received these MSDSs from Imerys, they never passed this warning information on to consumers, nor did Imerys. On September 26, 2012, the corporate representative of Imerys testified in open court that his company exclusively supplied J&J Defendants with talc used for its Baby Powder product and that ovarian cancer is a potential hazard associated with a women's perineal use of talc-based body powders, like J&J Defendants' Baby Powder, one of the Talcum Powder Products.

50.    In May 2008, the Cancer Prevention Coalition ("CPC"), joined by its chairman and numerous other physicians and chairs of public health and medical associations, submitted a citizen's petition seeking to require all cosmetic talc-based products to bear labels with warnings such as, "Frequent application of talcum powder in the female genital area *substantially* increases the risk of ovarian cancer" or "Frequent talc application in the female genital area is *responsible for major risks of*

ovarian cancer." (Emphasis added). The petition cited numerous studies and publications and sought a hearing to present scientific evidence. J&J and Imerys became aware of this petition in a timely manner following its publication.

51.     In 2011, Dr. Daniel Cramer  made public another case-control study of over 4,000 women. This study, which was funded by the National Cancer Institute ("NCF"), found a 200% to 300% increased risk of ovarian cancer for women who applied talc-based body powders to their perineum. This study found a strong dose-response relationship and explained why the dose-response has been under reported in prior studies. In commenting on this study, Dr. Cramer stated, "I have always advised gynecologists, if they examine a woman and see that she is using talc in the vaginal area, tell her to stop.... There are alternatives. This study strongly reinforces that advice." J&J Defendants and Imerys were aware of this study shortly after its publication. In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use in women. Rosenblatt, K.A., et al., *Genital powder exposure and the risk of epithelial ovarian cancer, 22 Cancer Causes Control* 737-742 (2011). J&J Defendants and Imerys were aware of these studies shortly after their publications.

52.     On October 19, 2012, J&J Defendants' former in-house toxicologist and current consulting toxicologist, Dr. John Hopkins, testified on J&J Defendants' behalf that J&J Defendants "[are] and were aware of... all publications related to talc use and

ovarian cancer." Imerys was aware of this testimony and of the publications to which it referred.

53. J&J Defendants continue to assert that the Talcum Powder Products are safe to use, even after 3 separate juries found that Talcum Powder Products were the cause of Decedent Annie Mae Setzer's ovarian cancer and that J&J Defendants failed to warn about the risk associated with their products. See *Deane Berg* v. *Johnson & Johnson Consumer Companies, Inc.*, (District of South Dakota, October 4, 2013); *Fox v. Johnson & Johnson et al,* (St. Louis, Missouri, February 22, 2016); and *Gloria Ristesund* v. *Johnson & Johnson et al,* (St. Louis, Missouri, May 2, 2016).

54. Despite the overwhelming scientific and medical evidence regarding talc use and ovarian cancer that has developed over the past several decades, the only warnings on Talcum Powder Products are to "Keep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." J&J Defendants provide similar warnings on their website: "For external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems." Imerys likewise provides no other consumer warnings.

55. None of J&J Defendants' warnings on the product label or in other

marketing informed users such as Decedent Annie Mae Setzer that use of the product in their genital area, as was encouraged by J&J Defendants, could lead to an increased risk of ovarian cancer or was a hazard. Instead, J&J Defendants continue to represent on the labeling and other marketing that Talcum Powder Products are "clinically proven to be safe, gentle and mild," and claim "clinically proven mildness."

56.     Decedent Annie Mae Setzer was deceived and mislead by J&J Defendants' and Imerys' omissions and deceptive representations that Talcum Powder Products are safe for women to use in the genital area.  Decedent Annie Mae Setzer purchased and used Talcum Powder Products reasonably believing, to her detriment, that the products were safe for use. Talcum Powder Products are advertised for use by women and do not instruct that the products may lead to an increased risk for ovarian cancer when used in the genital area. Because J&J Defendants claim that the products are clinically proven safe and mild, their omissions and representations were a material factor in influencing Decedent Annie Mae Setzer's decision to purchase the Talcum Powder Products.   She would not have purchased Talcum Powder Products had she known that they were not safe and that the use of the products could lead to an increased risk for ovarian cancer.  Her reasonable expectation was that Talcum Powder Products were safe to use in the genital area.

57.     As a result, Decedent Annie Mae Setzer was damaged in her purchases and uses of Talcum Powder Products and was deceived into purchasing products that

she reasonably believed, based on J&J Defendants' and Imerys' omissions and representations, were safe for use by women when, in fact, they are not.

58.     Imerys and J&J Defendants, by contrast, reaped and continue to reap enormous profits from their deceptive marketing and sale of talc and Talcum Powder Products.

## FACTS REGARDING DECEDENT ANNIE MAE SETZER

59.     Decedent Annie Mae Setzer was born and raised and spent much of her adult life North Carolina, but was a resident of Douglasville, Georgia at the time of her death.  During her life, she had 2 children and 4 grandchildren, 2 of whom she raised.  She was beloved by her family and friends and those in her church and community.

60.     Ms. Setzer applied Talcum Powder Products to her perineal regions twice a day for more than 70 years. As a direct and proximate result of Ms. Setzer's long-term use of Talcum Powder Products, she developed ovarian cancer and was diagnosed with it in 2014.

61.     On September 10, 2014, Decedent Annie Mae Setzer began experiencing severe stomach pain, which necessitated a trip to the emergency room.

62.     On September 13, 2014, Decedent Annie Mae Setzer was diagnosed with advanced ovarian cancer.

63.     Ms. Setzer suffered excruciating pain and suffering associated with

the development her cancer and up until the time of her death on October 4, 2014.

64.    Decedent Annie Mae Setzer justified relied on and/or was induced by the misrepresentations and/or active concealment of J&J Defendants and Imerys to purchase and use Talcum Powder Products to her detriment.

65.    At the time that Decedent Annie Mae Setzer was using Talcum Powder Products, J&J Defendants and Imerys knew or should have known that her use of the products created an increase risk to consumers of serious personal injury, including ovarian cancer.

66.    Despite this actual or constructive knowledge on the part of J&J Defendants and Imerys, they failed to warn Decedent Annie Mae Setzer of the serious risks before she used the products.

67.    Had Decedent Annie Mae Setzer known about the risks and dangers associated with Talcum Powder Products, she would not have used them, would not have developed ovarian cancer and would not have died on October 4, 2014.

68.    Decedent Annie Mae Setzer did not discovery, nor did she have any reason to discover that her ovarian cancer was a result of the defective Talcum Powder Products and wrongful conduct of the defendants.

69.    As a direct and proximate result of using J&J Defendants and Imerys' products, on September 13, 2014, Decedent Annie Mae Jackson learned that she had developed ovarian cancer, from which she later died.

70.     Jackie Epps, as the Putative Administratrix of the Estate of Annie Mae Setzer, seeks compensatory damages for physical, emotional, and psychological pain and suffering associated with the development, spread, and treatment of Decedent Annie Mae Setzer's ovarian cancer and subsequent death from ovarian cancer.   Jackie Epps also seeks punitive damages against J&J Defendants and Imerys for, among other things, for their deliberate calculated suppression of the truth associated with their marketing and use of a known carcinogenic product that contains no warning. The talc in Talcum Powder Products is mined in China and is shipped in containers that are required to be prominently labeled as "Carcinogenic," yet Talc Defendants and Imerys give no such warning on the plastic bottles of its Talcum Powder Products.

## Count One:  Strict Liability
### (J&J Defendants and Imerys)

71.     Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

72.     J&J Defendants and Imerys mined, designed, selected, inspected, formulated, tested, manufactured, assembled, equipped, marketed, advertised, distributed, and sold its talc and Talcum Powder Products.

73.     J&J Defendants and Imerys mined, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed and sold the carcinogenic

talc that was used in Talcum Powder Products.

74.     J&J Defendants sold Talcum Powder Products as a new product more than ten years before the filing of this action, but any statutes of repose or limitation are tolled because of J&J Defendants' fraud, negligent misrepresentation, and fraudulent concealment, and conduct equivalent to that required to impose punitive damages against J&J Defendants. Imerys supplied the raw talc to J&J Defendants.

75.     At all times, Imerys knew of the unreasonably dangerous and carcinogenic nature of the talc it was selling to J&J Defendants, especially when used in a woman's perineal regions and it knew J&J Defendants were not warning consumers of these dangers and hazards.

76.     J&J Defendants and Imerys had a legal duty to design, inspect, test, mix, manufacture, label, formulate, and assemble Talcum Powder Products so that they would be reasonably safe in the foreseeable and normal uses to which they would be put and for which J&J Defendants advertised they could be used.

77.     Among other things, the Imerys' talc and Talcum Powder Products are defective and carcinogenic, and are unreasonably dangerous, hazardous, and unsafe for foreseeable users.

78.     J&J Defendants and Imerys failed to adequately warn Decedent Annie Mae Setzer, and other consumers, or the public in general, about the unsafe and

defective formulation and the hazards and carcinogenicity of the Imerys' talc and Talcum Powder Products, so that individuals like Decedent Annie Mae Setzer could make informed and prudent decisions regarding use of those Talcum Powder Products.

79.     The defective and hazardous nature of Imerys' talc Talcum Powder Products was the proximate cause of the damages sustained by Decedent Annie Mae Setzer, as set forth herein, thus rendering J&J Defendants and Imerys strictly liable.

## Count Two:  Negligence
## (J&J Defendants)

80.     Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

81.     For the many reasons set out above, J&J Defendants were negligent in designing, formulating, inspecting, testing, manufacturing, assembling, marketing, advertising, selling and providing incomplete and inadequate warnings for its defective and hazardous Talcum Powder Products, as set out in the paragraphs above.

82.     J&J Defendants' negligence was the proximate cause of the damages sustained by Decedent Annie Mae Setzer, as set forth herein.

## Count Three:  Negligence
## (Imerys)

83.     Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

84.     At all pertinent times Imerys had a duty to exercise reasonable care in mining, labelling, formulating, inspecting, testing, manufacturing, assembling, marketing, advertising and selling talc and the Talcum Powder Products.

85.     At all pertinent times, Imerys mined and sold talc to J&J Defendants, which Imerys knew was then being packaged and sold to consumers by J&J Defendants.   Further, Imerys knew that consumers were using the Talcum Powder Products to powder their perineal regions.

86.     Imerys knew, at all pertinent times, that the use of talcum powder based products in the perineal area significantly increased the risk of ovarian cancer, as shown by studies dating back to the 1960s.

87.     At all pertinent times, Imerys knew that J&J Defendants were not providing warnings to consumers of the Talcum Powder Products about the risks of developing ovarian cancer from talc.

88.     For the many reasons set out above, Imerys was negligent in providing and selling talc to the J&J Defendants, while knowing how the J&J Defendants sold and marketed its Talcum Powder Products.   During that time, Imerys took no adequate steps to ensure that the ultimate consumers of the Talcum Powder Products, including Decedent Annie Mae Setzer, were told of the information that Imerys has about the carcinogenic properties of talc, including its

risk of causing ovarian cancer.

89.   Imerys' negligence was a proximate cause of the damages sustained by Decedent Annie Mae Setzer, as set forth herein.

## Count Four: Breach of Implied Warranty
## (J&J Defendants and Imerys)

90.   Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

91.   J&J Defendants breached its implied warranty of merchantability by selling J&J Defendants' defective and hazardous Talcum Powder Products when they were not fit for the ordinary purpose for which such goods are sold.

92.   This breach of warranty by J&J Defendants was a proximate cause of the damages sustained by Decedent Annie Mae Setzer, as set forth herein.

## Count Five:  Fraud and Fraudulent Concealment
## (J&J Defendants and Imerys)

93.   Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

94.   J&J and Imerys intentionally concealed material facts from Decedent Annie Mae Setzer, and the consuming public.  J&J Defendants and Imerys knew that Talcum Powder Products were formulated, designed and manufactured with unsafe, hazardous, and carcinogenic talc, but concealed those material facts.  J&J Defendants,

in concert with Imerys, recklessly manufactured and distributed Talcum Powder Products to Decedent Annie Mae Setzer and other consumers in the United States. Those consumers had no knowledge of the hazards and carcinogenic nature of the Talcum Powder Products.

95. J&J Defendants and Imerys had a duty to disclose the facts and dangers of talc to Decedent Annie Mae Setzer and the public who used its Talcum Powder Products, but failed and refused to do so.

96. J&J Defendants and Imerys knew that Decedent Annie Mae Setzer had no knowledge of those facts and that neither Annie nor the public had an equal opportunity to discover the facts. J&J Defendants, on the other hand, had complete knowledge of the defects and hazards in its Talcum Powder Products. Decedent Annie Mae Setzer trusted J&J Defendants not to sell them a product that contained a substance that J&J Defendants knew to be a carcinogen and hazardous, and that caused ovarian cancer. Decedent Annie Mae Setzer further trusted J&J Defendants to stop selling the product, warn of defects, warn of hazards, and to recall Talcum Powder Products.

97. By failing to disclose these material facts, J&J Defendants, acting in concert with Imerys, intended to induce Annie to purchase Talcum Powder Products and/or to continue to use them.

98.    Decedent Annie Mae Setzer, and other women, reasonably relied on J&J Defendants' reputation and nondisclosure and Imerys' silence, and reasonably but unknowingly continued to use Talcum Powder Products over long periods of time.

99.    Decedent Annie Mae Setzer would not have purchased Talcum Powder Products had she known of the hazards and dangers of the products, and certainly would not have continued to use it once she learned of dangerous cancer causing nature of Imerys' talc and Talcum Powder Products.

100.    J&J Defendants and Imerys reaped the benefit of the sales of Talcum Powder Products as a result of its nondisclosure to Annie, and the public.

101.    As a direct and proximate result of J&J Defendants' and Imerys' wrongful conduct and fraudulent concealment Decedent Annie Mae Setzer, and other women, suffered the damages described herein.

102.    J&J Defendants' and Imerys' conduct was knowing, intentional, and with malice, demonstrated a complete lack of care, was in reckless disregard for the rights of Decedent Annie Mae Setzer and other women who used the Talcum Powder Products, and justifies, warrants and demands that punitive damages be awarded.

## Count Six:   Negligent Misrepresentation
## (J&J Defendants)

103.    Plaintiff incorporates all preceding statements and allegations of

Plaintiff's Complaint and re-alleges as if expressly set forth herein.

104.    At all relevant times, Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, testing, marketing, promoting, advertising, selling, and/or distribution of its defective and hazardous Talcum Powder Products.

105.    At all relevant times, J&J Defendants had a duty to disclose to consumers and to the public material facts about Talcum Powder Products, including the material fact that application of Talcum Powder Products to the female perineal area causes a significantly increased risk of ovarian cancer and constituted a health hazard.

106.    Through their actions and omissions in adverting, promoting, labeling, and otherwise, J&J Defendants made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Decedent Annie Mae Setzer concerning the character, safety, and effectiveness of the Talcum Powder Products.

107.    Those misrepresentations and omissions included, but are not limited to:

a. J&J Defendants labelled and advertised Talcum Powder Products for use in more places that just under the arms. It promoted use of the Talcum Powder Products in such places to make the user feel dry, fresh, and comfortable throughout the day and urged users

to use talcum Powder Products all over their bodies.

b. J&J Defendants urged women to use Talcum Powder Products all over, and urged them to use those products to soothe areas irritated by friction.   It urged them, for example, to apply Talcum Powder Products after a bikini wax as a way to help reduce irritation and discomfort.

c. In so doing, J&J Defendants misrepresented to consumers like Decedent Annie Mae Setzer that Talcum Powder Products were safe for use all over the body, including the female perineal area.

d. Despite having actual knowledge of the health hazards of its Talcum Powder Products, J&J Defendants failed to disclose to the consumers and to Annie, through adequate warmings, representations, labels, or otherwise, that Talcum Powder Products were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

e. Despite having actual knowledge that the use of Talcum Powder Products in the perineal area created a significant increased risk of ovarian cancer, J&J Defendants failed to disclose to consumers, like Decedent Annie Mae Setzer, through adequate

warmings, representations, labels, or otherwise, that material fact.

108.    At all relevant timers, J&J Defendants failed to exercise reasonable care in ascertaining or sharing information with Decedent Annie Mae Setzer regarding the safe use of Talcum Powder Products, failed to disclose material facts to Decedent Annie Mae Setzer indicating that Talcum Powder Products were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning Talcum Powder Products to Decedent Annie Mae Setzer and/or concealed relevant facts that were known to J&J Defendants.

109.    At all relevant times, Decedent Annie Mae Setzer was not aware of the falsity or existence of foregoing misrepresentations or omissions, nor was she aware that material facts concerning Talcum Powder Products had been concealed or omitted.    In reasonable reliance upon J&J Defendants' misrepresentations and omissions, Decedent Annie Mae Setzer, and others were induced to buy and use Talcum Powder Products in the perineal area. If J&J Defendants had disclosed the accurate and material facts concerning the hazards of its Talcum Powder Products, Decedent Annie Mae Setzer would not have bought Talcum Powder Products and would not have used such products on her body in that manner.

110.    Decedent Annie Mae Setzer 's reliance upon J&J Defendants' misrepresentations and omissions was justified and reasonable, because, among other

reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts about Talcum Powder Products and the association between Talcum Powder Products and the increased risk of ovarian cancer, while Annie was not in a position to know those material facts, and because J&J Defendants failed to warn or give notice to Decedent Annie Mae Setzer, and other consumers, thereby inducing them to use Talcum Powder Products in lieu of safer alternatives and in ways that created unreasonably dangerous risks to her health.

111.    At all relevant times dating back to the early 1970s, J&J Defendants' corporate officers, including each of its incumbent CEOs, chairmen, directors, and/or managing agents, knew of and ratified the acts of Talc defendants, as alleged herein.

112.    At all relevant times, J&J Defendants' current Chairman and CEO, Mr. Alex Gorsky, knew of the fact that the raw talc used in Talcum Powder Products was labelled CARCINOGENIC when shipped to the United States in bulk containers.

113.    Notwithstanding Chairman and CEO Gorsky's knowledge that the talc was labelled CARCINOGENIC when shipped to the United States, J&J Defendants has neither pulled its Talcum Powder Products from the marketplace nor given a prominent and adequate warning to consumers about the dangers and hazards of talc as a known cause of ovarian cancer.

114.    As Chairman and CEO, Mr. Alex Gorsky is the highest ranking executive

in J&J Defendants and his main responsibilities include developing and implementing high-level strategies, making major corporate decisions, managing the overall operations and resources of the company.   He also reports to the Board of Directors.

115.   As Chairman and CEO, Mr. Alex Gorsky has the final authority to order and direct the removal of hazardous J&J Defendants products from the marketplace.

116.   As Chairman and CEO, Mr. Alex Gorsky has the final authority to require adequate and effective warnings to be placed on J&J Defendants products.

117.   J&J Defendants' direct and indirect misrepresentations, and its omissions about the dangers and hazards of its Talcum Powder Products, and those of its Chairmen and CEOs over the course of J&J Defendants' history, proximately caused the injuries and damages, including the death, of Decedent Annie Mae Setzer.

118.   Decedent Annie Mae Setzer, and other similarly situated women had the right to know what J&J Defendants knew about the risk of ovarian cancer caused by talc.

## Count Seven:   Georgia Fair Business Practices Act
## (J&J Defendants and Imerys)

119.   Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

120.   Georgia's Fair Business Practices Act ("FBPA"), O.C.G.A. § 10-1-393(a),

declares unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce to be unlawful.

121.    J&J Defendants and Imerys have violated the Georgia FBPA, by engaging in unfair, false, misleading, and/or deceptive acts or practices as set out in Paragraphs 1 through 139 herein.

122.    J&J Defendants' and Imerys' FBPA violations were one of the proximate causes of Decedent Annie Mae Setzer's injuries and damages.

## Count Eight: Punitive Damages
### (J&J Defendants and Imerys)

123.    Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

124.    J&J, through its conduct in designing, testing, manufacturing, assembling, formulating, marketing, misrepresenting, selling and failing to adequately warn of the dangers of Talcum Powder Products, and Imerys in providing the raw talc to J&J while knowing how they would use it, demonstrated an entire want of care and fraud, malice, and further demonstrated a reckless indifference for the health, safety, and welfare of women generally, and of Decedent Annie Mae Setzer, specifically. Plaintiff show that, pursuant to O.C.G.A. § 51-12-5.1, J&J Defendants' and Imerys' conduct is unprincipled and unconscionable. As such, J&J Defendants' and Imerys' conduct warrants, justifies, and demands the imposition of punitive damages to

punish, penalize, and deter J&J Defendants and Imerys, and other similarly situated vendors of talc, from continuing to sell such a hazardous and unreasonably dangerous product to consumers for application to the genital area on their bodies.

## Count Nine: Attorney's Fees and Expenses
## (J&J Defendants and Imerys)

125.  Plaintiff incorporates all preceding statements and allegations of Plaintiff's Complaint and re-alleges as if expressly set forth herein.

126.  J&J Defendants' and Imerys' actions have been in bad faith and have caused Decedent Annie Mae Setzer to suffer unnecessary trouble and expense. Plaintiff is, therefore, entitled to recover from J&J Defendants and Imerys all expenses of litigation, including attorney's fees, costs and expenses pursuant to O.C.G.A. § 13-6-11.

**PRAYER FOR RELIEF** Wherefore, Plaintiff Jackie Epps, as Putative Administrator for the Estate of Annie Mae Setzer, prays for:

a.     A judgment against J&J Defendants and Imerys in an amount sufficient to fully and fairly compensate the Estate of Annie Mae Setzer for her physical, psychological, emotional injuries, her past medical bills prior to her death, her funeral expenses, the full value of her life that was cut short by the Defendants and all of the general and special damages incurred by her;

b.      All  damages  and  penalties  permitted  under  the
Georgia  Fair  Business  Practices  Act,  including  but  not  limited  to
punitive  and  treble  damages—  and  an  injunction  to  require  the
Imerys  and  J&J  Defendants  and  to  (1)  stop  selling  its  Talcum
Powder  Products  without  the  same  kinds  of  labels  and  warnings  that
the  miners  and  shippers  of  raw  talc  receive  and  (2)  to  stop  selling
its  Talcum  Powder  Products  for  hygienic  use  on  or  around  the
genital  area;

c.      An  award  of  punitive  damages  in  such  amount  as  to
punish,  penalize  and  deter  Imerys  and  J&J  Defendants  and  other
similar  situated  companies;

d.      An  award  of  attorneys'  fees  and  costs  against  all
Defendants;  and

e.      Such  further  relief  as  may  be  just,  proper,  and
reasonable  under  the  circumstances.

**JURY DEMAND** Plaintiff demands a trial by jury on all issues so triable.

DATED:      September 29, 2016.

Respectfully submitted,
**THE CUFFIE LAW FIRM**
/s/ Thomas F Cuffie
Thomas F. Cuffie
Georgia Bar No. 200150
**Attorneys for Plaintiff**
3080 Campbellton Road Southwest
Atlanta, Georgia 30311
(404) – 344 – 4242